LUTTIG, Circuit Judge,
dissenting:
As I have written previously, I believe that in recent years our Circuit has progressively charted its own course in the area of federal court abstention, a course quite different from that required of us by congressional statute and by Supreme Court precedent. See Johnson v. Collins Entertainment Co., 199 F.3d 710, 730 (1999) (Luttig, J., concurring in judgment) (explaining that the majority, though reaching the correct result, worked a substantive change in the law of abstention). This case, decided by the same panel that decided Johnson, highlights well just how far my colleagues have gone in converting what is intended as “an extraordinary and narrow exception” to our duty to decide cases otherwise properly before us, Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 728, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996) (internal citations omitted), into almost a rule of obligatory federal abstention, independent of whether there exists either an imperative or peculiar need for state court adjudication. For, at least on a principled application, Burford abstention would be required in virtually every diversity case by today’s opinion, a result supported by *352 no authority, not even those in our Circuit, and certainly none of those relied upon by the majority.
In the precedents that are relied upon by my colleagues, the presented issue was one already pending in some department within a comprehensive state regulatory scheme comprised of “a variety of legislative, administrative and judicial mechanisms,” Johnson, 199 F.3d at 715, that was created in response to something like “as thorny a problem as has challenged the ingenuity and wisdom of legislatures,” Burford v. Sun Oil Co., 319 U.S. at 318, 324 (1943) (grants of permits for drilling of oil fields in Texas, where “an additional permit may affect pressure on a well miles away”), to “a state of public crisis,” that necessitated an emergency legislative session, Brandenburg (state’s savings and loan industry), or to “arguably ... the most hotly contested issue in Lthat particular. state] in recent years,” Johnson, 199 F.3d at 715 (video poker). And, in all of these cases, the issue was “imbued with sufficient local character that the state courts ought [have been] accorded comity from the federal courts with respect to its regulation.” Johnson, 199 F.3d at 731 (Luttig, J., concurring in judgment). Neither of these sine qua non for federal abstention exists in the case before us today. Indeed, this is as garden-variety a diversity case as one could imagine, indisputably requiring, under statute and established Supreme Court caselaw, federal court adjudication.
Betraying the dearth of authority available to support the court’s broad-gauged expansion of Burford’s limited exception, the majority portrays this case as closely analogous to Brandenburg v. Seidel, 859 F.2d 1179 (4th Cir.1988). The actual facts underlying our decision in Brandenburg reveal that that case is anything but support for the majority’s conclusion; indeed, if anything, Brandenburg is affirmative authority for precisely the opposite conclusion from that reached by the majority. As we explained in Brandenburg, there, the Governor of Maryland, in response to a panic that threatened to lead to the collapse of the state’s savings and loan industry, literally declared a state of public crisis; issued an executive order limiting withdrawals to $1,000 per account per month from all Maryland Savings Share Insurance Corporation institutions; and called the Maryland General Assembly into an emergency session. The Assembly in turn enacted a package of legislation, establishing “a comprehensive framework for the administration of conservatorship and receivership proceedings for insolvent savings and loan associations.” Brandenburg, 859 F.2d at 1182. That legislation created a state-operated deposit insurance fund, the Maryland Deposit Insurance Fund, which had “exclusive and plenary jurisdiction over all claims, actions, and proceedings ... brought by any person and ... related to the assets, property, powers, privileges, duties and liabilities” of the savings and loan institution in question. As we observed, that legislation was “designed to deal comprehensively with the crisis in the state’s savings and loan industry.” Id.
By contrast, the receivership here is of the most unexceptional kind. It did not arise out of a public crisis, though Maryland certainly knows how to declare one, and it certainly is not the product of special legislative session. Neither did it originate from a distinct and comprehensive mechanism created to address the problem of viatical settlement fraud that faces the Answer Care receivership. As the majority correctly (though inconsistently with its own conclusion) remarks, this receivership is governed by Title 13 of the Maryland Rules of Court, which applies to virtually all receivership proceed *353 ings, see Md. R. Ct. 13-102, legislation- the like of which is common-place in every state in the Union. And, unlike the threat represented by - the imminent collapse of the entire savings and loan industry, which was addressed by the legislation in Brandenburg, viatical settlement fraud, though no doubt a problem, has not prompted any heated public debate at all, much less any of the type which, in turn, gave rise to “the complex administrative system that [the state] had established,” in Burford, whose very purpose was being threatened by parallel federal litigation. Compare with Burford, 319 U.S. at 332, 63 S.Ct. 1098 (“The whole cycle of federal-state conflict cannot be permitted to begin again.”).
By holding that the receivership we consider in this case is, for purposes of Bur-ford abstention, analogous to the' one in Brandenburg, and hence, that abstention is warranted, the majority has, .as I predicted in Johnson, all but completed its transformation of Burford’s exception to decision into an exception to abstention, in open departure from our “virtually unflagging obligation ... to exercise [the] jurisdiction” conferred upon us by Congress, Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 821, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). See Johnson, 199 F.3d at 730 (Luttig, J., concurring) (noting that the majority was affecting “a substantive change in the law of abstention from a doctrine of exception to a doctrine of rule”). Such is the ineluctable consequence of the elevation of a state’s everyday interest in “preventing further harm to the public, and in providing investors with some compensation so that the scam does not leave them completely high and dry” to a “substantial” interest for abstention purposes, ante at 349, and of the countenance of abstention on nothing more than the mere (and unidentified) potential for conflict with state regulatory law or policy.
As Congress has required by statute, and the Supreme Court has required by decision, I would require the district court to decide this dispute, which was properly before that court for decision. There is no imperative or peculiar need for state court adjudication. Although it has again fallen on deaf ears, I can only repeat what I said in Johnson: “It is not our[ duty] either to interpret the [jurisdictional] statute narrowly or to expand our own judicial en-graftations because we disagree with the Congress that our doors should be open to such disputes.” Johnson, 199 F.3d at 729 (Luttig, J., concurring in judgment).