KITTITAS RECLAMATION DISTRICT,
Plaintiffs-Appellees,

v.

SUNNYSIDE VALLEY IRRIGATION
DISTRICT, et al.,
Defendants-Appellants.

Nos. 80–3505, 81–3002, 81–3068
and 81–3069.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 8, 1982.

Decided Feb. 6, 1985.

Amended June 14, 1985.

Donald H. Bond, Charles C. Flower, Flower & Andreotti, Yakima, Wash., for defendants-appellants.

Anne Almy, Land & Natural Resources Div., Dept. of Justice, Washington, D.C., Thomas G. Nelson, Twin Falls, Idaho, for plaintiffs-appellees.

Before KILKENNY, WRIGHT, and CANBY, Circuit Judges.

## AMENDED OPINION

EUGENE A. WRIGHT, Circuit Judge.

The opinion filed on September 10, 1982, is withdrawn and replaced by this opinion. The 1982 opinion was withheld from publication during our consideration of the petitions for rehearing.

The petitions for rehearing by Sunnyside Valley Irrigation District (Sunnyside), Union Gap Irrigation District (Union Gap), and Yakima Valley Canal Company (Yakima Valley), supported by amicus curiae briefs of the State of Washington, are denied. The petitions for rehearing by Sunnyside, Union Gap, Yakima Valley, and Yakima-Tieton Irrigation District filed after our February 6, 1985 opinion also are denied.

In the fall of 1980, the district court ordered water released from a Yakima water project reservoir to preserve redds (nests of salmon eggs) threatened by low post-irrigation season water flows. We must decide whether the district court had authority to order the water released.

This appeal involves the collision of two interests: the Yakima Nation's interest in preservation of their fishing rights, and the eastern Washington farmers' interest in preservation of water needed for crops in the dry spring and summer. Irrigation districts in eastern Washington protest the district court's interference with their interests.

The Yakima Nation's interest dates back to its 1855 treaty with the United States. Article III reserved to the Indians "[t]he exclusive right of taking fish in all the streams ... bordering [the] reservation ... also the right of taking fish at all usual and accustomed places, in common with citizens of the Territory...." 12 Stat. 951, 953 (1855).

The farmers' interest stems from the irrigation and storage systems constructed by the Reclamation Service in 1909 to 1933, and a 1945 consent decree, which specified the amounts of water to be delivered to the appellant irrigation districts during the irrigation season. The district court retained jurisdiction over the consent decree's interpretation and administration. It entered the orders on appeal under this jurisdiction.

The Chinook salmon normally spawn in the fall when the water in a river is near its lowest levels. This practice ensures that in a natural river system, the spawning site will remain covered with water throughout the year. But artificially high irrigation releases in the early fall of 1980 caused the

salmon to misjudge. If officials closed the Cle Elum dam as usual, to begin winter storage, approximately 60 redds would have been exposed and destroyed.

When the Yakima Nation discovered this, it requested the irrigation system's court-appointed watermaster to maintain the water flow. The watermaster, in turn, asked the district court for instructions.

The court held two hearings. At the first, in October 1980, it concluded that the 1945 consent decree did not consider the Yakima Nation's treaty fishing right. Thus, the decree did not limit or preclude measures necessary to preserve that right when operation of the irrigation system threatened to damage the salmon run. Because of the immediacy of the problem, the court ordered release of necessary water until the next hearing, held in November 1980.

After the November hearing, the court issued additional instructions to the watermaster regarding the 1980 to 1981 nonirrigation season. These authorized (1) continued release of water, as necessary, to preserve the redds; (2) use of alternative measures to preserve the redds, such as diversionary berms and transplantation; and (3) monitoring of the redds' condition. The court also ordered a study of methods for subsequent irrigation seasons (including regulation of reservoir releases during the spawning season) that would accommodate the needs of farmers and, at the same time, preserve the salmon run.

The irrigation districts argue that the court lacked jurisdiction because its order exceeded the scope of authority reserved in the consent decree. Alternatively, they argue that a pending state court adjudication of Yakima basin water rights deprived the court of jurisdiction.

Substantively, the irrigation districts argue that any water right associated with the Indians' fishing right was abrogated by Congress before the consent decree, or in its settlement. They claim also that the decree is res judicata of any water right.

## ANALYSIS

 The district court did not exceed the scope of its retained jurisdiction under the consent decree.[1] Paragraph 20 gave the court jurisdiction "over matters of interpretation of this judgment and matters relating to the administration thereof." Appellants argue that this clause limits the court's jurisdiction to disputes between the parties to the decree.

No such limitation appears. The decree specifically stated that it did not adjudicate the rights of persons not made parties, including the Yakima Nation.[2] The court properly assumed jurisdiction to interpret the decree in light of the Nation's treaty fishing right.

 Nor was the district court required to dismiss the proceeding in favor of a state court action generally adjudicating water rights in the Yakima River basin, *State of Washington v. Acquavella*, No. 77–2–01484–5 (Yakima Co. Super.Ct., filed Oct. 12, 1977). Appellants' reliance on *Colorado River Water Conservation District v. United States (Akin)*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), is misplaced.

*Akin* does not hold that a pending state action adjudicating water rights automati-

---

1. Although neither side argues that mootness or lack of finality bar our jurisdiction, we must examine this issue on our own initiative. *Louisville & Nashville R.R. v. Mottley*, 211 U.S. 149, 152, 29 S.Ct. 42, 43, 53 L.Ed. 126 (1908); *Willis v. Craig*, 555 F.2d 724, 726 (9th Cir.1977).

 We find no lack of finality because we have reviewed similar orders issued by the district court pursuant to its continuing jurisdiction over the consent decree. *See Kittitas Reclamation Dist. v. Sunnyside Valley Irrigation Dist.*, 626 F.2d 95 (9th Cir.1980), *cert. denied*, 449 U.S. 1079, 101 S.Ct. 861, 66 L.Ed.2d 802 (1981). Nor

is this case moot because the challenged orders could not be fully litigated prior to the end of their effective period and the situation may arise again. *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 348–49, 46 L.Ed.2d 350 (1975) (per curiam).

2. Paragraph 20 of the consent decree reads in part: "The rights of any claimants to water of the Yakima River or watershed who are not parties to this case shall in no way be prejudiced or affected by this judgment...."

cally deprives the district court of jurisdiction over issues implicating water. Rather, the *Akin* Court found only that, based on consideration of several factors,[3] dismissal of the federal suit in favor of state proceedings was justified by wise judicial administration and efficiency.

Those factors are not present here. In *Akin,* the parties intended both the federal and state court proceedings to be general adjudications of all water rights in the area. The United States had filed only the complaint when the defendants moved to dismiss it in favor of the state proceeding. Here, the district court interpreted a decree entered by it in 1945. The parties intended no general adjudication of water rights and no party moved to dismiss the federal suit.

We do not find that the district court acted inconsistently in denying removal of the *Acquavella* action based on the *Akin* factors while retaining jurisdiction here. As noted above, the two actions have little in common.

 Because the 1945 consent decree was not a general adjudication of all water rights in the Yakima River Basin and did not adjudicate the treaty rights of the Yakima Nation,[4] appellants' res judicata argument also fails.

 In October 1980, the watermaster and other parties presented the district court with an emergency. The scheduled closing of the dam threatened the redds with destruction. Information on alternative means of preserving the redds was noticeably absent. The court granted the Department of the Interior more time to study the problem and temporarily ordered the water levels maintained in sufficient amount to preserve the redds.

At the second hearing, experts in the field of fish biology testified and suggested actions for preserving the redds other than release of water. One suggested that if 12 of the redds were transplanted, the dam could be closed. The judge ordered these measures taken, including transportation of the endangered redds, construction of berms to divert water into secondary channels, and the opening of some of those channels. Because he was unsure of the effect of these measures, he continued the watermaster's authority to release water as necessary.

We find no abuse of discretion in the court's decision. It was empowered to issue orders directing the allocation of water within the Yakima River system. Its orders authorizing the watermaster to preserve the 1980 redds were reasonable emergency measures.

The order for further study of the problem was reasonable under the circumstances. The study would provide data necessary to insure future disputes could be resolved in the most efficient way.

We affirm the district court's orders.[5]

**3.** The factors weighing in favor of dismissal in *Akin* were: (1) that the McCarran Amendment evinced a clear federal policy in favor of general, unified water rights adjudication; (2) that the state had a comprehensive system for adjudicating and managing water rights; (3) that the United States had filed only its complaint in federal court before the defendants moved to dismiss in favor of the state proceeding; (4) that over 1,000 defendants were named, indicating extensive involvement of state water rights; (5) that the federal court was located farther from the area in question; and (6) that in other state water divisions, the United States had voluntarily participated in ongoing state water adjudication.

**4.** The 1945 decree resulted from a suit filed by the United States in 1939, seeking a declaration of their responsibilities to various contract holders in the Yakima Irrigation System. Neither side joined the additional parties that would have been necessary for a general adjudication, like the one involved in *Nevada v. United States,* 463 U.S. 110, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983). The final decree settled only the rights of the irrigation districts made party to the proceeding.

**5.** We need not decide the scope of fishing rights reserved to the Yakima Nation under the 1855 treaty.